UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   *Plaintiff*,

  vs.              Case No. 24-cr-164

PETER BRAUN,

   *Defendant*.

## MOTION TO SUPPRESS

In September 2020, the National Center for Missing and Exploited Children ("NCMEC") received four alerts via the CyberTipline for apparent child pornography that appeared to have been uploaded by Peter Braun as either email or chat attachments. Neither Google, Microsoft nor NCMEC viewed the files at issue, which matched the hash values of known child pornography files. NCMEC forwarded the tips to Wisconsin law enforcement. In January 2021, Wisconsin DCI agent Aaron Koehler was assigned to investigate the tips. Without a warrant, Koehler examined the files and determined them to constitute child pornography. Koehler then obtained a search warrant for Braun's residence, yielding the evidence that forms the basis of the charges in this case. This motion seeks to suppress that warrant as a fruit of Agent Koehler's warrantless search.

### I. Factual Background

Microsoft and Google are technology companies that operate several internet-based communication platforms, including Skype, Gmail, and others. Both Google and

*Federal Defender Services*
*of Wisconsin, Inc.*

Microsoft have tools that help detect suspected child pornography. Microsoft uses a proprietary hash-matching technology called PhotoDNA.[1] Google uses artificial intelligence and hash matching to identify both known child pornography and new content.[2] Google also has "content reviewers," human beings who can confirm suspected child pornography or Child Sexual Abuse Material ("CSAM").[3] Both companies are required to report suspected child pornography identified on their platforms to NCMEC's CyberTipline.[4]

NCMEC is "a non-profit organization established by Congress to help prevent child abduction and sexual exploitation."[5] One of its core functions, mandated by federal law, is to manage the CyberTipline, a clearinghouse for complaints of child pornography. Those complaints generally include a brief description of the incident, the date and time of the complaint, the webpage or program involved, and the email, username, and IP address of the person reported.[6] Important here, the report will also provide information about the files that were uploaded, including whether the reporting electronic service

---

[1] *Digital Safety Content Report*, Microsoft: Corporate Social Responsibility, *available at*: https://www.microsoft.com/en-us/corporate-responsibility/digital-safety-content-report (last viewed Dec. 3, 2024).
[2] *How we detect, remove and report child sexual abuse material*, Google (Feb. 17, 2023); *available at*: https://blog.google/intl/en-au/company-news/outreach-initiatives/how-we-detect-remove-and-report-child-sexual-abuse-material/
[3] *Id.*
[4] *Supra*, n. 1, 2.
[5] Steven Alexander, *Understanding NCMEC CyberTipline Reports*, HGExperts.com, *available at*: https://www.hgexperts.com/expert-witness-articles/understanding-ncmec-cybertipline-reports-53197 (last accessed Dec. 9, 2024)
[6] *Id.*

2

*Federal Defender Services*
*of Wisconsin, Inc.*

provider (ESP) viewed the file.[7] Upon receiving a report via the CyberTipline, NCMEC will review it and refer it out to a law enforcement agency.

In this case, on September 8, 2020, NCMEC received three reports via the Cyber Tipline from Microsoft. *See* Ex. 1-3. Those reports each indicated that an image file had been uploaded through Skype by a user with the screenname "p▮▮▮▮▮▮" and IP address 24.240.98.219. As to each file, Microsoft reported that it had not viewed the contents of the uploaded files. Rather, Microsoft reported that images matched to hash values of known child pornography.

The next day, September 9, 2020, NCMEC received an additional report via the CyberTipline from Google. *See* Ex. 4. That report indicated that one file had been uploaded and stored in Google's Gmail program by "Pete B" from the IP address 24.240.98.219.[8] The report indicated that Google had not viewed the contents of the uploaded file.

NCMEC reviewed each of the reports and provided a geolocation of the IP address that uploaded the images, placing it in Lomira, Wisconsin. It noted that the reports were related to one another and that NCMEC had not opened or viewed any of the files suspected to be child pornography.

On October 10, 2020, NCMEC forwarded the reports to the Wisconsin Department of Justice. A DCI Program and Policy Analyst reviewed the CyberTipline reports and

---

[7] *Id*.
[8] The report also indicated that the emails associated with "▮▮▮▮▮" were "▮▮▮▮▮▮▮▮▮▮ail.com" and "▮▮▮▮▮▮▮▮▮▮oo.com."

3

*Federal Defender Services*
*of Wisconsin, Inc.*

issued an administrative subpoena to Charter Communications for the subscriber information for the IP address at issue. On November 10, 2020, Charter Communications provided records showing that the IP address 24.240.98.219 belonged to Peter Braun at ▇ Mary Ln, ▇ in Lomira, Wisconsin. It also provided an email address and phone number for Braun.

According to reports, on January 12, 2021, DCI Special Agent Aaron Koehler was assigned to investigate the four CyberTipline Reports. Special Agent Koehler viewed the images and determined them to be child pornography. Based on these conclusions, on February 2, 2021, Special Agent Koehler conducted surveillance of the Mary Lane residence, observing a truck registered to Peter Braun. Agent Koehler also received information from the Lomira Police Department that in 2015, a teacher of Peter Braun's then 15-year-old son reported that Braun's son disclosed that he had observed Braun communicating online with very young girls.

On March 2, 2021, Agent Koehler obtained a state search warrant for Braun's Mary Lane apartment. *See* Ex. 5. The affidavit in support of that warrant included the circumstances recited above. Namely, it recounted the four NCMEC CyberTipline reports. Ex. 5 at ¶¶ 31-33, 35. It then described the images that Agent Koehler had viewed and Agent Koehler's belief that the images constituted child pornography under Wisconsin law. Ex. 5 at ¶¶ 34, 36. The affidavit then recounted the results of the administrative subpoena, showing that Braun was the subscriber of the IP address used to upload the files. Ex. 5 at ¶ 38. It then recounted Special Agent Koehler's surveillance

and the fact that a truck at the Mary Lane residence was registered to Braun. Finally, it recounted the 2015 report that Braun's son reported to a teacher that Braun was chatting online with young girls. Ex. 5 at ¶ 39.

The warrant, which was signed by Dodge County Circuit Court Judge Joseph Sciascia, authorized the search of Braun's residence and any electronic media or storage device in the residence. On March 4, 2021, law enforcement executed the warrant. Braun was present and arrested. Police recovered several electronic devices and a case of compact discs and CD-ROM. On March 5, 2021, Braun was charged in Dodge County Circuit Court with five counts of possessing child pornography. The charges related to files contained on a few of the optical disks found in Braun's residence. Braun was released on a signature bond, and he complied with the conditions of his release. In October 2021, Braun pled guilty to three of the charges and on February 2, 2022, he was sentenced to three years in prison, to be followed by three years of extended supervision.

While Braun's state case was pending, law enforcement continued to investigate Braun. Law enforcement's review of the optical disks in Braun's home caused law enforcement to believe that Braun had communicated over the internet with minors, sometimes using video streaming chat rooms, and recorded those communications, some of which involved the minors engaging in sexually explicit conduct. Those are the files that constitute the charges in this case. On August 20, 2024, the government obtained a

5

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:24-cr-00164-LA   Filed 12/09/24   Page 5 of 17   Document 20

five-count indictment charging Braun with production of child pornography.[9] *See* Dkt. 1.

**II.     Argument**

The Fourth Amendment to the Constitution of the United States guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend IV. That guarantee extends to a person's email. *United States v. Ackerman*, 831 F.3d 1292, 1304 (10th Cir. 2016). Here, Agent Koehler searched Braun's email and Skype instant messaging and examined a file he sent. That search required a warrant unless one of the exceptions to the warrant requirement was present. The typical exception invoked in cases like this is the private search doctrine, which "permits government officials, without a warrant, to repeat a search of personal papers and effects already conducted by a private party, so long as the government does not expand upon the prior private search." *United States v. Maher*, 120 F.4th 297, 309 (2d Cir. 2024). But here, because Agent Koehler's search did expand upon the prior private searches, the private search doctrine does not apply. As a result, the fruits of Agent Koehler's warrantless search must be suppressed.

---

[9] The government's apparent theory is that Braun produced child pornography by recording online chats in which minors engaged in sexually explicit conduct. The government does not allege that Braun ever had in-person contact with any of the minors referenced in the indictment.

6

*Federal Defender Services
of Wisconsin, Inc.*

### a. Agent Koehler conducted a warrantless search when he opened and viewed the images disclosed by Microsoft.

The Fourth Amendment is implicated when law enforcement searches an item in which an individual has a reasonable expectation of privacy. *See, e.g.*, *United States v. Plancarte*, 105 F.4th 996, 999 (7th Cir. 2024) (citing *Katz v. United States*, 389 U.S. 347, 361, (1967) (Harlan, J., concurring)). Braun had a reasonable expectation of privacy in the files he sent using Gmail and Skype. *See, e.g.*, *Maher*, 120 F.4th at 307 (holding that one generally has a reasonable expectation of privacy in their emails); *United States v. Warshak*, 631 F.3d 266, 283–88 (6th Cir. 2010) (same); *United States v. Zelaya-Veliz*, 94 F.4th 321, 334 (4th Cir. 2024) (noting "the consensus of federal courts that private electronic communications are generally protected by the Fourth Amendment, even when transmitted over third-party platforms"). Indeed, the files Braun shared are the modern-day equivalent of the 'papers' and 'effects' explicitly protected by the Fourth Amendment. *See Warshak*, 631 F.3d at 285–86; *Ackerman*, 831 F.3d at 1304 ("No one in this appeal disputes that an email is a 'paper' or 'effect' for Fourth Amendment purposes, a form of communication capable of storing all sorts of private and personal details.")

Braun did not lose Fourth Amendment protection simply because he relied on third party providers to store his files. The third parties in this case—Google and Microsoft—merely acted as intermediaries for Braun's private action of storing/sharing files. That these third-party intermediaries had the ability to access Braun's files does not vitiate his reasonable expectation of privacy. *See Warshak*, 631 F.3d at 286-87; *Katz v. United States*, 389 U.S. at 352–53 (individuals retain a Fourth Amendment interest in the content

7

*Federal Defender Services*
*of Wisconsin, Inc.*

of their phone conversations, despite the ability of an operator to listen in); *Ex parte Jackson*, 96 U.S. 727, 733 (1877) (the contents of letters sent through the postal service retain Fourth Amendment protection, even though the letters are entrusted to an intermediary).

Similarly, Braun did not forfeit Fourth Amendment protection by passively agreeing to Google and Microsoft's terms of service when he used their services. *See, e.g.*, *Maher*, 120 F.4th at 307-08 (holding Google's service terms, which give Google the ability to view users' content, "did not extinguish [the defendant's] reasonable expectation of privacy in that content as against the government"); *see also* Orin S. Kerr, *Terms of Service and Fourth Amendment Rights*, 172 U. Pa. L. Rev. 287, 291 (2024) (arguing that service terms are private contracts that "have little effect in Fourth Amendment law" because the Fourth Amendment protects individuals against intrusion by "the government rather than private parties").

Accordingly, Agent Koehler's examination of Braun's files constituted a search under the Fourth Amendment requiring a warrant supported by probable cause.

### b. The Private Search Doctrine does not apply.

The government will often argue that the private search doctrine applies to law enforcement examinations of files included in NCMEC CyberTipline reports. The private search doctrine is grounded in the idea that the Fourth Amendment's protections against unreasonable searches and seizures do not apply to searches conducted by private individuals, provided they are not acting as agents or instruments of the state. *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997); *United States v. Koenig*, 856 F.2d 843 (7th

8

Cir. 1988). When a private party conducts a search and subsequently contacts law enforcement, the Fourth Amendment is not triggered unless the police exceed the scope of the initial private search. *Koenig*, 856 F.2d at 852 n. 10 ("So long as the government's search does not exceed the scope of the private search, it is reasonable."); *United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021) ("authorities typically may repeat a private search already conducted by a third party but may not expand on it").

Two recent appellate court decisions inform the private search analysis in the context of NCMEC CyberTipline reports. In October, the Second Circuit decided *Maher*. Two weeks later, the Ninth Circuit decided *United States v. Holmes*, 121 F. 4th 727 (9th Cir. 2024). The facts of those cases are essentially identical to the facts here.

In *Maher*, Google alerted NCMEC to apparent child pornography that was identified by a matching hash value to known child pornography. 120 F. 4th at 303. As is the case here, "[n]o one at Google visually examined the contents of the…file before reporting it to" NCMEC. *Id.* at 301. And, like here, NCMEC also did not open the file or visually examine its contents. *Id.* at 303-04. NCMEC forwarded the complaint on to law enforcement. *Id.* Like here, upon receiving the image, a police investigator examined the image without a warrant, determined it to contain child pornography, and sought a state court search warrant. *Id.* at 304.

The Second Circuit found that the officer's warrantless search of the image sent to NCMEC violated the Fourth Amendment. *Id.* at 307-09. The Court held, in the first instance, that people have an expectation of privacy in their email communications, and

9

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:24-cr-00164-LA   Filed 12/09/24   Page 9 of 17   Document 20

in the second instance, that Google's terms of service did not extinguish that expectation of privacy as against the government. *Id*. As a result, "to justify its warrantless search…, the government had to show that it simply repeated the private search of that file already conducted by Google." *Id*. at 309. The court framed the question as whether "the private search doctrine authorizes law enforcement authorities to conduct a warrantless visual examination of the contents of a digital file" when an ESP "has not visually examined the contents of that file but, rather, has used a computer to match the hash value of the contents of that file to the hash value of an image previously located in another file" that constituted child pornography. *Id*. at 314. While the court noted that the matching hash values may have provided probable cause for a search warrant, "the private search doctrine does not authorize a warrantless visual examination of that computer-matched image." *Id*.

*Holmes* involved the same circumstances. Facebook alerted NCMEC to suspected child pornography based on a matching hash value. 121 F. 4th at 730. But, as here, Facebook did not examine the image. *Id*. at 731. NCMEC passed the report on to the FBI who viewed the images without first obtaining a warrant and confirmed that they were child pornography. *Id*. Based on that, the FBI agent obtained a warrant for Holmes's residence. *Id*. at 732. There, the government conceded, and the Ninth Circuit accepted, that the agents' review of the image was a search that triggered the warrant requirement. *Id*. at 734.

10

Both *Maher* and *Holmes* found support in *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021), another case with indistinguishable facts to those here. In *Wilson*, Google flagged email attachments as child pornography based on a matching hash value and submitted a report to the NCMEC CyberTipline. *Id*. at 964. No one at Google viewed the images. *Id*. Nor did NCMEC, who forwarded the report on to law enforcement. *Id*. An officer viewed the images without a warrant, then applied for a warrant for Wilson's home and email account based on the content of the images. *Id*. The court concluded that the private search doctrine did not permit the search of the images because "the government search exceeded the scope of the antecedent private search[.]" *Id*. at 973.

*Wilson, Holmes* and *Maher* are helpful for another reason. Each case reviews and refutes two other appellate court decisions that reached the opposite conclusion. In *United States v. Reddick*, 900 F.3d 636, 639 (5th Cir. 2018) and *United States v. Miller*, 982 F.3d 412, 429–30 (6th Cir. 2020), the Fifth and Sixth circuits respectively held that a detective's visual examination of an image identified by a provider as matching the hash value of previously identified child pornography did not exceed the scope of the private search. This Court should follow *Maher* and *Wilson* and reject the flawed reasoning in *Reddick* and *Miller*.

First, while the court in *Reddick* concluded that "opening the file merely confirmed that the flagged file was indeed child pornography, as suspected," 900 F.3d at 639, the Fourth Amendment does not "permit law enforcement officials to conduct warrantless searches of unopened property to confirm a private party's report—however strong—

that the property contains contraband," *Maher*, 120 F.4th at 315. Second, the court in *Reddick* misinterpreted *United States v. Jacobsen*, 466 U.S. 109 (1984), to conclude that a detective's visual examination of an image fell under the private search doctrine even though it went beyond the scope of the examination employed by the private party. In *Jacobsen*, the Supreme Court held that the Fourth Amendment is not violated when an agent inspects an object previously inspected by a private party and learns "nothing that had not previously been learned during the private search," 446 U.S. at 120, but that the private search doctrine does *not* apply when an agent "exceed[s] the scope of the private search." *Id.* at 122; *see also United States v. Wilson*, 13 F.4th 961, 978 (9th Cir. 2021) (declining to follow *Reddick* in part because the court "conflate[d]" *Jacobsen's* two holdings).

The court in *Miller* rejected the Fifth Circuit's reasoning in *Reddick*, 982 F.3d at 429, but nonetheless concluded that a detective's visual examination of a hash-matched image is authorized by the private search doctrine because hash-matching creates a "virtual certainty" that the visual examination will reveal the same evidence uncovered in the private party's hash-value search. *Id.* at 429-30. But it's just not the case that a detective's visual examination of a hash-matched image reveals nothing more than a hash-value search. As explained above, Agent Koehler visually examined files that had not been previously opened or examined by employees from Google or Microsoft. This visual examination revealed more information than the hash-value matching that preceded it. The reliability of hash-matching technology may be relevant to whether probable cause can be shown to obtain a warrant to visually examine the suspect files, but it's not relevant

12

*Federal Defender Services of Wisconsin, Inc.*

to the question of whether the government's search exceeded the scope of the private search. *See Wilson*, 13 F.4th at 979.

On that point, a recent Seventh Circuit case is also helpful. In *United States v. Bebris*, the Seventh Circuit took up the question of whether Facebook was acting as a government agent when it monitored the defendant's Facebook account for suspected child pornography that it would be legally obligated to report to law enforcement. 4 F.4th at 562. There, like here, Facebook identified a hash value that matched to a known image of child pornography. *Id.* at 554. But unlike here, a Facebook employee reviewed the image, confirmed it to be child pornography and reported it to NCMEC. *Id.* at 556-557. The defendant argued that Facebook took on the role of a government agent. The Seventh Circuit disagreed and went on to assess the applicability of the private party doctrine to the facts of the case.

The court ruled that under the private search doctrine, "authorities typically may repeat a private search already conducted by a third party *but may not expand on it*[.]" *Id.* at 560 (emphasis added). Because Facebook had opened and reviewed the images, neither NCMEC nor law enforcement's review of the images expanded on or exceeded the scope of Facebook's private search. Thus, the private search doctrine applied.

That is not the case here. As the CyberTipline reports demonstrate, neither Microsoft nor Google ever reviewed the files to determine if they contained child pornography. They simply noted that there was a match in hash value with known child pornography. So, Special Agent Koehler's review of the images did expand upon and

13

*Federal Defender Services of Wisconsin, Inc.*

Case 2:24-cr-00164-LA   Filed 12/09/24   Page 13 of 17   Document 20

exceed the scope of Microsoft and Google's review. Thus, the private search doctrine does not apply.

One final case is worth highlighting. In *United States v. Ackerman*, the defendant sent an email with attachments through AOL. 831 F.3d at 1294. AOL's filter identified the attached images as child pornography through a hash value and reported it to NCMEC's CyberTipline. *Id*. A NCMEC analyst viewed the images and confirmed that they appeared to be child pornography. *Id*. Ackerman moved to suppress the fruits of the NCMEC investigation. The government argued that NCMEC was not a government agency for Fourth Amendment purposes and that the private search doctrine applied. *Id*. at 1295. In an opinion authored by then Judge, and now Supreme Court Justice Gorsuch, the Tenth Circuit disagreed.

The first issue—whether NCMEC is a government agency for Fourth Amendment purposes—isn't of much consequence here, as Agent Koehler, not NCMEC, examined the uploaded files. Koehler, a DCI Special Agent is undoubtedly a government actor. The second issue, however, is directly on point. Of the government's private search argument, the court found that AOL had determined that there was a hash value match but found it significant that "AOL never opened the email itself." *Id*. at 1305-1306. Because NCMEC did, it "exceeded rather than repeated AOL's private search." *Id*. For that reason, the court found that the private search doctrine could not "help the government in this case."

In short, Agent Koehler's examination of Braun's files, which exceeded the scope of Microsoft and Google's inspection, was a warrantless search in violation of the Fourth

14

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:24-cr-00164-LA    Filed 12/09/24    Page 14 of 17    Document 20

Amendment. That examination provided the information which established probable cause for the warrant to search Braun's home.

The Seventh Circuit has long forbidden the use of "evidence obtained pursuant to a warrant … if the warrant was secured from a judicial officer through the use of illegally acquired information." *United States v. Oakley*, 944 F. 2d 384, 386 (7th Cir. 1991); *see also Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392 (1929) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."). Thus, the warrant must be reevaluated without the illegally obtained information. *See United States v. Johnston*, 876 F.2d 589, 592 (7th Cir. 1989) (quoting *United States v. Alexander*, 761 F.2d 1294, 1300 (9th Cir. 1985)) ("In reviewing the validity of a search warrant supported by an affidavit containing information that is in part unlawfully obtained … we must consider whether 'the untainted information, considered by itself, establishes probable cause for the warrant to issue.'"); *United States v. Johnson*, No. 20-CR-214-JPS, 2022 WL 102277, at *11 (E.D. Wis. Jan. 11, 2022) ("any analysis of the affidavit at this juncture would necessarily exclude all illegally obtained information, leaving very little, if anything, to work with."). The balance of the affidavit does not establish probable cause. Thus, the warrant must be suppressed.

   c. **The Good Faith Doctrine does not apply.**

The government may argue that the good faith doctrine should apply. The good faith doctrine provides evidence obtained in objectively good faith reliance on a

15

*Federal Defender Services of Wisconsin, Inc.*

Case 2:24-cr-00164-LA    Filed 12/09/24    Page 15 of 17    Document 20

subsequently invalidated search warrant should not be excluded. *United States v. Leon*, 468 U.S. 897, 918-21 (1984). It has since been expanded to apply where police rely in good faith on then-existing binding precedent. *See United States v. Velazquez*, 906 F.3d 554, 555 (7th Cir. 2018); *Davis v. United States*, 564 U.S. 229, 241 (2011) (when binding appellate precedent specifically authorizes a particular police practice, the exclusionary rule should not apply if that precedent is later overturned by the Supreme Court).

Because there is no binding appellate precedent authorizing Agent Koehler's search of the files, the good faith doctrine cannot save this warrantless search. *See Holmes*, 121 F. 4th at 735 (rejecting application of the good faith doctrine because "existing precedent discussing the private-search doctrine did not specifically authorize Agent Steele to view the Facebook images without a warrant."). The legal landscape was unsettled at best. *Id*. And while that might have made it plausible that the search would fall within the scope of the private search doctrine, that isn't enough to validate a warrantless search. *Id*; *see also Wilson*, 13 F.4th at 980 n. 14 (acknowledging district court's conclusion that if agent's warrantless actions constituted an illegal search, no exception "would prevent operation of the exclusionary rule.").

### III. Conclusion

Microsoft and Google identified files as potential child pornography and alerted NCMEC. Both entities flagged for law enforcement that they had not reviewed the files at issue. Despite that, DCI Special Agent Aaron Koehler examined the files without a warrant. Because he exceeded the scope of Google and Microsoft's inspections, the

16

*Federal Defender Services*
*of Wisconsin, Inc.*

private search doctrine does not apply. In sum, this was a warrantless search, and its fruits, including the search warrant for Braun's residence, must be suppressed.

Dated at Milwaukee, Wisconsin, this 9th day of December, 2024.

Respectfully submitted,

*/s/ Joshua D. Uller*
Joshua D. Uller, WI Bar #1055173
Federal Defender Services
　of Wisconsin, Inc.
411 E. Wisconsin Avenue – Suite 2310
Milwaukee, WI  53202
Tel.  (414) 221-9900
Email:  joshua_uller@fd.org

*Counsel for Defendant,* Peter Braun