UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                          Case No.  24-CR-164

PETER BRAUN,
                    Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS

The United States of America, by and through its attorneys, Gregory J. Haanstad, United States Attorney, and Megan J. Paulson and Karine Moreno-Taxman, Assistant United States Attorneys, hereby submits the following memorandum requesting that this Court deny the defendant's motion to suppress.

I.     **BACKGROUND/FACTS**

a.  **INVOLVEMENT OF MICROSOFT AND GOOGLE**

On September 7 and 8, 2020, the defendant uploaded four images of suspected child pornography, using the Electronic Service Providers (ESPs), Microsoft and Google. Two of the four images were uploaded by use of Microsoft. Both had the same hash value and were therefore the same images. A third image was also uploaded by use of Microsoft and a fourth image was uploaded by use of Google. The third Microsoft and the fourth Google image had the identical hash value and therefore were the same image.

A hash value is "a string of characters obtained by processing the contents of a given computer file and assigning a sequence of numbers and letters that correspond to the file's contents." *United States v. Reddick*, 900 F.3d 636, 637 (5th Cir. 2018).  Hash values are "regularly

used to compare the contents of two files against each other," *id.*: "If two nonidentical files are inputted into the hash program, the computer will output different results. If the two identical files are inputted, however, the hash function will generate identical output." Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 541 (2005).

Hash values are used by electronic service providers, like Microsoft and Google, to fight child sexual abuse materials (CSAM). Company employees, trained on the legal definition of child pornography, view suspect images and tag them according to a four-tiered industry classification standard for different types of CSAM. When an image is confirmed to be CSAM, its hash value is recorded in a company repository. *See, e.g., United States v. Miller*, 982 F.3d 412, 419 (6th Cir. 2020) ("[n]o hash is added to [Google's] repository without the corresponding image first having been visually confirmed by a Google employee to be apparent child pornography") (quoting Google declaration). In addition, the National Center for Missing and Exploited Children (NCMEC) maintains a database of known child pornography hash values. Each hash value in the NCMEC database similarly corresponds to a file that someone has opened, viewed, and determined to be child pornography. Electronic service providers can "automatically scan the hash values of user-uploaded files and compare them against the hash values of known images of child pornography." *Reddick*, 900 F.3d at 637-638. When a match is discovered, these electronic service providers send alerts to NCMEC, transmitting the hash value(s) along with information about the relevant user or uploader.

Federal law does not require ESPs to undertake all of these efforts. *See* 18 U.S.C. § 2258A(f). But it does require providers who become aware of CSAM on their services to report it to NCMEC, a private nonprofit entity established by Congress. *See* 18 U.S.C. §§ 2258A(a),

2258E(6). NCMEC then forwards "CyberTip[s]" to the appropriate law-enforcement agency for follow-up investigation. 18 U.S.C. § 2258A(a)(1)(B)(ii), (c).

In this case, neither Microsoft nor Google opened the specific images uploaded by the defendant. Based on their hash values, however, both providers determined that the images contained CSAM, and they therefore alerted NCMEC. Each ESP also immediately shut down the defendant's accounts such that the defendant no longer had control of the accounts or their content.[1]

### b. INVOLVEMENT OF NCMEC AND CREATION OF FOUR CYBERTIP REPORTS

NCMEC opened an investigation into each hash value provided and compared the hash values they received from Microsoft and Google with their database of known hash values that had previously been identified as CSAM. NCMEC then began to prepare four CyberTip reports, one for each hash value (Exhibits 1-4 filed by the defense), and included their investigation regarding the hash values in their reports. NCMEC did not view any of the images they described in their NCMEC CyberTip reports.

NCMEC reported that all four hash values came from the same location in Lomira, Wisconsin. The CyberTip reports also noted that two different email addresses were used (*wichargerguy@gmail.com* and *charger962000@yahoo.com*). Both email accounts had the name "Pete B" associated with them. In addition, one of the hash values provided by the ESPs had a file name of "pedomom-and-son.jpeg," (see Defendant's Exhibit 4 p.2), which is a common type of

---

[1] According to Microsoft's terms and conditions (3.6), for example, it uses "automated technologies to detect child pornography or abusive behavior that might harm the system, our customers, or others." Users are not allowed to "engage in any activity that exploits, harms, or threatens to harm children." "Child pornography violates the law as well as our terms of service, which makes clear that we use automated technologies to detect abusive behavior that may harm our customers or others," Mark Lamb from Microsoft's Digital Crimes Unit told the BBC. "In 2009, we helped develop PhotoDNA, a technology to disrupt the spread of exploitative images of children, which we report to the National Center for Missing and Exploited Children as required by law." See https://www.microsoft.com/en-us/DigitalSafety/policies for further details of their policy.

name used to identify files that contain child pornography. Those seeking child pornography often use such a title to conduct a word search of files that would contain child pornography (in this instance, those involving a mother committing sexual abuse of her minor son).

Before they forwarded the CyberTips, NCMEC vetted the hash values received against their own hash list and categorized one image as being an A1 image, meaning that it is of "a prepubescent minor" and includes a "sex act" -- that is, "sexually explicit conduct (actual or simulated sexual intercourse including genital-genital, oral-genital, anal-genital, or oral-anal whether between person of the same or opposite sex), bestiality, masturbation, sadistic or masochistic abuse, degradation, or any such depiction that lacks serious literary, artistic, political, or scientific value." (See p. 3 of Defendant's Exhibit 1). NCMEC categorized two other hash values as being A2 images, meaning that the images were of "prepubescent minors" and included a "lascivious exhibition"-- that is, any image depicting nudity and one or more of "restraint, sexually suggestive poses, focus on genitals, inappropriate touching, adult arousal, spreading of limbs or genitals, and such depiction lacks serious literary, artistic, political, or scientific value." (See p. 3 of Defendant's Exhibit 2 and p. 3 of Defendant's Exhibit 3).

NCMEC then electronically forwarded the four CyberTip reports to law enforcement in Wisconsin based upon the location of the IP address. Wisconsin Department of Justice-Division of Criminal Investigation (DCI) Special Agent (SA) Aaron Koehler was assigned to this case on January 12, 2021.[2]

---

[2] For some perspective: In 2022, Wisconsin DOJ investigated 7,039 CyberTip reports, which amounted to a 740 percent increase in CyberTip reports since 2013. according to data provided by the State of Wisconsin Attorney General's Office.

### c. INVOLVEMENT OF WISCONSIN DEPARTMENT OF JUSTICE-DIVISION OF CRIMINAL INVESTIGATION (DCI) SPECIAL AGENT (SA) AARON KOEHLER

Special Agent Koehler began his investigation by reviewing administrative subpoenas for Charter Communications regarding the IP address used in the CyberTips. Charter provided the subscriber information belonging to that IP address on November 10, 2020, and the defendant, Peter Braun, at 960 Mary Lane, Apartment 6, Lomira, WI 53048-9569, was the listed subscriber. The records from Charter further showed that the IP address had been assigned to the defendant and to his address from January 28, 2020, through September 21, 2020, dates that included the time period of the CyberTips. SA Koehler then downloaded the CyberTips and related files from the Internet Crimes Against Children data system which were provided by NCMEC. SA Koehler transferred the files onto an optical disc which allowed him to visually see the images. He was able to see what image corresponded with each CyberTip, but he did not view the defendant's copy of these images, nor did he have access to the defendant's copy.

Special Agent Koehler then prepared an affidavit in support of the search of the defendant's residence. Prior to presenting his affidavit to the judge, he had the warrant affidavit reviewed and approved by Special Assistant District Attorney Robert Barrington. Dodge County Circuit Court Judge Joseph Sciascia signed it on March 2, 2021. The warrant detailed all the evidence described above as well as the fact that the defendant resided at the residence listed to the IP address provided by Charter. As the warrant described, Agent Koehler also conducted surveillance of the residence and observed a Dodge Ram parked in front which he determined was registered to the defendant at the same residence. As further described in the warrant, he received a report from the Village of the Lomira Police Department that was dated December 9, 2015. The report detailed information passed on to law enforcement by a teacher of the defendant's 15-year old son who

resided with his father at 960 Mary Lane, Apartment 6, Lomira, WI 53048-9569. The report alleged that the defendant had been observed by his son chatting/interacting online with very young girls.

The search warrant was executed on March 4, 2021. Numerous images and videos containing CSAM were found in the residence. Images which matched the hash values of the four included in the CyberTip reports, were also found on the defendant's electronic devices. In addition, several compact discs (CD's) inside a disc case were found in the defendant's closet. Those CDs were categorized with handwritten labels using dates, first names, and ages of females. Special Agent Koehler began to review the CD's and found that they contained what appeared to be copies of live encounters with numerous young children ranging in various ages.

Based on his investigation and his review of the CDs, SA Koehler began to look for the victims filmed in the CDs, and he was able to locate some of them. Those who he was able to locate remembered the defendant well and identified themselves in the CDs. Each victim independently told SA Koehler that the defendant had approached them in a similar manner using various chat applications. The defendant would then convince them to chat with him privately on Skype. When the victims were approached, on the chat applications, they were between the ages of nine and fourteen, while the defendant was between the ages of forty-four and fifty. At first the defendant would not reveal his age, making them believe he was about the same age as them. In fact, he showed one victim his juvenile son's picture and claimed that it was a picture of himself. When the defendant moved their conversations to Skype, the victims were told or realized that he was of an older age, and he told them his first name. Over time, on Skype, the defendant began to ask them to undress themselves and show him different parts of their bodies (including their genitals). He escalated his demands by directing them to masturbate in front of him and telling

them to insert various objects into their vaginas (including toothbrushes, screwdrivers, and hairbrushes). He also told them to perform sexual acts with their pets and other individuals (in one instance a seven-year-old cousin and in another instance a child's grandfather). All these events were recorded by the defendant and catalogued by him in the CDs. Unbeknownst to the victims, the defendant recorded their conversations and the various sexual acts he requested them to perform. The defendant often also masturbated himself while watching the videos, which was recorded and recovered on some of the CDs.

On August 20, 2024, a federal grand jury in the Eastern District of Wisconsin returned a four-count indictment charging the defendant with Production of Child Pornography. On December 9, 2024, the defendant filed a motion to suppress the evidence that was recovered during the search warrant executed at his home. None of the four counts charged in the indictment were based on the images described in the warrant.

II.     **ARGUMENT**

The defendant claims that the exclusionary rule should be applied on the theory that Special Agent Koehler violated his Fourth Amendment rights by opening and viewing child-pornography files identical to ones that the defendant had uploaded to Microsoft and Google—when Microsoft and Google had already scanned the files, determined that they were images previously identified as child pornography, and sent them to NCMEC, which in turn sent the files to Special Agent Koehler. That claim fails for three independent reasons: (1) no Fourth Amendment violation occurred; (2) even if it did, the warrant contained sufficient probable cause excluding the challenged content; and (3) even if this court disagrees with the first two points, the good-faith exception to the exclusionary rule applies. The motion should be denied.

A.     No Fourth Amendment Violation Occurred

The Fourth Amendment's protection against unreasonable searches and seizures applies only to intrusions by government actors, not to searches conducted by private parties. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme Court held that a government search that follows a private search of the same effects comports with the Fourth Amendment so long as it does not exceed the scope of the private search. *See also, e.g., United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021). That "private search" doctrine resolves the Fourth Amendment issue raised here.

In *Jacobsen*, Federal Express employees opened a damaged cardboard box and found crumpled newspaper covering a tube containing "a series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing about six and a half ounces of white powder." 466 U.S. at 111. After notifying federal agents of their discovery, the employees put the plastic bags back inside the tube and placed the tube and newspapers back into the box. *Id*. When the first federal agent arrived, he removed the bags from the tube and saw the white power. *Id*. The agent then opened each of the plastic bags and removed a trace of the white powder, which a field test confirmed was cocaine. *Id*. at 111-112.

In holding that the agent's actions and the field test were constitutionally permissible, the Supreme Court began with the proposition that the "initial invasions of [the] package were occasioned by private action" and therefore did not implicate the Fourth Amendment. *Jacobsen*, 466 U.S. at 115. And once the private search had occurred, the Court reasoned, "[t]he additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." *Id*. That rule, the Court explained, rests on the principle that "[o]nce frustration of the original expectation of privacy occurs, the Fourth

Amendment does not prohibit governmental use of the now nonprivate information." *Id.* at 117. Rather, the "Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id*.

Applying that standard in *Jacobsen*, the Supreme Court concluded that the agent's "viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." 466 U.S. at 119-120. The Court found that, "[e]ven if the white powder was not itself in 'plain view' because it was still enclosed in so many containers and covered with papers, there was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell him anything more than he already had been told." *Id*. at 118-119. The "advantage" the government gained from reexamining the contents of the box, the Court explained, "was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy." *Id*. at 119. The Court similarly found that "the removal of the plastic bags from the tube and the agent's visual inspection of their contents" was not a Fourth Amendment search because those actions "enabled the agent to learn nothing that had not previously been learned during the private search." *Id*. at 120. The Court reasoned that "the package could no longer support any expectation of privacy," in part because "[t]he agents had already learned a great deal about the contents of the package from the Federal Express employees, all of which was consistent with what they could see." *Id*. at 121.

The Supreme Court also concluded that the field test of the white powder did not constitute a Fourth Amendment search. *Jacobsen*, 466 U.S. at 122-126. The Court explained that "[t]he field test at issue could disclose only one fact previously unknown to the agent--whether or not a suspicious white powder was cocaine." *Id*. at 122. Relying in part on its reasoning in *United States v. Place*, 462 U.S. 696 (1983), the Court explained that "[a] chemical test that merely discloses

whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy" because "Congress has decided … to treat the interest in 'privately' possessing cocaine as illegitimate." *Jacobsen*, 466 U.S. at 123; *see id.* at 123-125 (discussing *Place*). The Court thus reasoned that "the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment." *Id*. at 124.

The logic of *Jacobsen* resolves this motion. Microsoft and Google, private actors, scanned the defendant's uploaded files, compared them to databases of CSAM hash-values, and identified specific CSAM files. *See Bebris*, 4 F.4th at 561-562 (concluding that ESPs like Facebook are functioning as private actors in performing this function). Those hash-value matches indicated with almost absolute certainty that the defendant's file contained CSAM, and defendant does not suggest otherwise. Microsoft and Google then sent only the matched hash values to NCMEC, which in turn sent them to law enforcement. Because Microsoft's and Google's actions had already revealed that the files matched previously identified CSAM images, SA Koehler's viewing of the files did not reveal anything material beyond what Microsoft and Google had already reported, and it did not "compromise any legitimate interest in privacy" that the defendant still possessed in the images. *Jacobsen*, 466 U.S. at 124. At most, SA Koehler's viewing of the files was akin to the government agents' decision to conduct chemical tests on the white powder in *Jacobsen*, which the Supreme Court approved.

As the defendant observes, two courts of appeals have endorsed that reasoning and found no Fourth Amendment violation on very similar facts. *See Reddick*, 900 F.3d 636 (5th Cir.); *Miller*, 982 F.3d 412 (6th Cir.). In the Government's view, those opinions are correct and consistent with Supreme Court precedent. Two other courts of appeal have disagreed, however, finding that the

private-search doctrine does not authorize law enforcement's visual examination of a (privately) computer-matched image. *See United States v. Maher*, 120 F.4th 297 (2d Cir. 2024); *United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021). The latter courts have reasoned that viewing the images amounted to a "more expansive search" than the one conducted by private companies. *Maher*, 120 F.4th at 315; *but see United States v. Holmes*, 121 F.4th 727, 744-747 (9th Cir. 2024) (Collins, J., dissenting on this point). The Seventh Circuit has not addressed this question, although it has confirmed that ESPs are functioning as private actors in searching for and matching CSAM hash values. *Bebris*, 4 F.4th at 561-562.

Contrary to the defendant's motion, the Tenth Circuit in *Ackerman* did not resolve this question either. *See United States v. Ackerman*, 831 F.3d 1292, 1306-1307 (10th Cir. 2016) (Gorsuch, J.)). In *Ackerman*, a government agent opened an email containing four attachments and viewed all four attachments, only one of which a private party (AOL) had determined had a hash value that matched child pornography. *Id.* at 1306. In light of its determination that "opening the email and viewing the [other] three attachments … was enough to risk exposing private, noncontraband information that AOL had not previously examined," the Tenth Circuit expressly declined to resolve the question at issue here, *i.e.*, whether a government agent conducts a Fourth Amendment search by opening a single file after a private party determines *that* file's hash value matches the hash value of a child-pornography image. *Id.* at 1306-1307. *Ackerman* is thus fully consistent with *Reddick, Miller,* and the Government's argument here.

In the Government's view, the Fifth and Sixth Circuits have this right: A police officer may view an image, which matches the hash-value sent by an ESP and is verified to contain child pornography, without violating the Fourth Amendment. It simply makes no sense that a defendant would retain a cognizable privacy interest in a CSAM image that Microsoft or Google removed

11

from his account—even after Microsoft and Google shut down those accounts and the defendant lost any access to those images. Indeed, the defendant himself consented to those procedures through terms of service in establishing his accounts.[3]

That is particularly clear in this case, where SA Koehler did not even view the *defendant's* copy of these CSAM images; instead, he viewed identical (hash-matched) images provided by NCMEC. The defendant himself had no cognizable privacy interest in the images already saved in law enforcement databases, as "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). There is no dispute that the *exact same* hash-value-matched images had previously been viewed by law enforcement and by private companies, in a process that did not implicate the defendant at all. SA Koehler's re-viewing of these images when they were flagged, via hash-matching, in defendant's accounts therefore did not "compromise any legitimate interest in privacy" that the defendant still possessed. *Jacobsen*, 466 U.S. at 124. The Government urges this court to adopt the approach of the Fifth and Sixth Circuits and deny the motion.

---

[3] For example, according to Randy Leonard, Security Counsel, Google LLC, in an email sent by him to the undersigned attorneys on December 18, 2024, Google's current Terms of Service (TOS) and all earlier (TOS) can be found at https://policies.google.com/termSArchive?hl=en-US (last visited on December 18, 2024). A review of the March 2020 TOS spells out the terms and restrictions more broadly, and then are more specific regarding issues that are more clearly spelled out on follow-on, hyperlinked pages. For example, the "What we expect from you" subsection on the main page allows the user to link to the section entitled "service-specific additional terms" (which is also a hyperlink).The TOS explains that child pornography or CSAM cannot be placed on any part of Google's platform Also included in the "Terms of Service" and "Abuse program policies and enforcement" spell out the policies with respect to child abuse. Importantly, that page also explains the action Google will take if it detects such content, to include "reporting to the National Center for Missing & Exploited Children" and "disabling accounts." This provides notice to users of the implications of their violations.

**B.**	**In Any Event, the Warrant Was Supported by Probable Cause Even Excluding the Challenged Content.**

The defendant does not seek to suppress the precise images that SA Koehler viewed. Instead, he seeks to suppress the large volume of damning evidence recovered from the execution of a search warrant at his home, because the affidavit supporting that search warrant included SA Koehler's description of the images. That request must fail even if SA Koehler had violated the Fourth Amendment in viewing the images, because the search warrant was otherwise supported by probable cause.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Probable cause . . . is not a high bar." *Kaley v. United States*, 134 U.S. 320, 338 (2014). Whether probable cause existed to issue the warrant is examined under the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213 (1983). To find probable cause, the magistrate judge need only find that there is a "fair probability" that the search will reveal "evidence of a crime." *Gates,* 462 U.S. at 238. Moreover, a judge's finding of probable cause is given substantial deference upon review. *Gates*, 462 U.S. at 236; *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010).

Putting aside the viewing of the images, the warrant established that three different entities—Microsoft, Google, and NCMEC—each found hash matches in their respective databases that matched previously identified images of child pornography. The warrant also described SA Koehler's other investigative steps, as described above.

That evidence was more than sufficient to establish probable cause. In fact, as explained by this Court in *United States v. Feldman*, 2014 WL 7653617 (E.D. Wis. July 7, 2014), the matching hash values alone can establish that "the user has child pornography on his or her

13

computer." As a result, in this context "hash value matches alone [are] sufficient to establish probable cause." *Id.* at *10. Even the Second Circuit, in the *Maher* opinion relied upon by the defendant, emphasized the same point: When a company like Google has conducted CSAM hash matching, the Government may "rely on that computer match to demonstrate probable cause to support warrants for their own searches of [the target's] accounts and residence." *Maher*, 120 F.4th at 319; *see also id.* at 315 ("Google's report that the unopened Maher file contained an image whose hash value matched that of an image previously found in another file that, upon visual inspection, was determined to depict child pornography may well have provided authorities with strong probable cause to believe that the image in the Maher file also depicted child pornography and, thus, supported issuance of a warrant.").

In this case, the hash value matches were corroborated with additional evidence, including prior reporting that the defendant's son had observed him communicating with very young girls. The probable-cause analysis is therefore straightforward. In other words, even if no weight is given to the visual descriptions provided by the agent, the warrant would still be valid, and there is no basis for suppression.

C.      **Even if Probable Cause is Found Lacking, The Good Faith Exception Applies.**

In the event that the court disagrees with the above analysis, the suppression of evidence obtained during the search of the defendant's home and devices is still inappropriate, based on the good-faith exception to the exclusionary rule.

The exclusionary rule is a "'judicially created remedy'" that is "designed to deter police misconduct." *United States v. Leon*, 468 U.S. 897, 906, 916 (1984) (citation omitted). The rule does not apply "where [an] officer's conduct is objectively reasonable" because suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement

activity." *Id.* at 919. Instead, to justify suppression, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system" for the exclusion of probative evidence. *Herring v. United States*, 555 U.S. 135, 144 (2009). "[E]vidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Leon*, 468 U.S. at 919 (citation omitted).

In this case, it would have been reasonable for an officer to believe--like the unanimous Fifth and Sixth Circuit panels--that the Fourth Amendment allowed the officer to open and view hash-matched files after a private party determined that the defendant's files matched known CSAM. Indeed, when the warrant in question was signed—March 2, 2021—neither the Supreme Court nor *any* appellate court in the country had held that a warrant was required for the government to visually examine a hash-matched image in a file not opened by the service provider. Instead, the only appellate decisions on the books were *Reddick* (2018) and *Miller* (2020), which fully supported SA Koehler's actions, in addition to *Jacobsen* itself. As the Second Circuit held— in the *Maher* case on which the defendant relies, although he does not note this aspect of its holding—"[i]n such circumstances, we think it was objectively reasonable for [the investigator] to think that she did not need a warrant to visually examine" the hash-matched files. *Maher*, 120 F.4th at 321. Suppression is not appropriate "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011); (quoting *Leon*, 468 U.S. at 909).

That SA Koehler then applied for a warrant to obtain the evidence actually at issue here only underscores that the good-faith doctrine applies. When a challenged search occurs pursuant

to an invalid warrant, the fruits of that search may be admitted if the officers who executed it relied upon the warrant in good faith. *United States v. Yarber*, 915 F.3d 1103, 1106 (7th Cir. 2019); *United States v. Orozco*, 576 F.3d 745, 750 (7th Cir. 2009). An officer's decision to obtain a warrant creates a presumption that the officer acted in good faith. *Id.*; *United States v. Calligan*, 8 F.4th 499, 504 (7th Cir. 2021). The defendant can rebut that presumption by showing that the state court judge "wholly abandoned his judicial role," or otherwise failed in his duty to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police," or that the officer submitted an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002).

The defendant points to no such evidence here, and there is none. As described above, the warrant was supported by ample probable cause. And when SA Koehler applied for the warrant, he disclosed all the relevant circumstances that supported probable cause—*including* his viewing of the hash-matched images. A state prosecutor then approved the warrant and a state judge signed it. *See United States v. Rees*, 957 F.3d 761, 771 (7th Cir. 2020) (consulting with the prosecutor prior to applying for a search warrant provides additional evidence of the officer's objective good faith). A reasonable officer would rely on those determinations that the Fourth Amendment permitted the warrant. *See Leon*, 468 U.S. at 918-921. As a result, none of the evidence seized pursuant to the warrant should be suppressed.

**CONCLUSION**

For the aforementioned reasons, the government respectfully requests that the defendant's motion to suppress be denied.

Dated at Milwaukee, Wisconsin, this 3rd day of February, 2025.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:  *s/ Megan J. Paulson*
*s/Karine Moreno Taxman*
MEGAN J. PAULSON
Bar Number: 1035076
KARINE MORENO-TAXMAN
Bar Number:  1006835
Assistant United States Attorneys
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
E-Mail: Megan.Paulson@usdoj.gov
E-Mail:  Karine.Moreno-Taxman@usdoj.gov