# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.    Case No. 24-CR-164

PETER BRAUN,

    Defendant.

# RECOMMENDATION AND ORDER

## 1. Procedural History

Peter Braun is charged with production of child pornography. (ECF No. 1.) He filed a motion to suppress (ECF No. 20) and a motion to seal (ECF No. 21). His motion to suppress seeks suppression of the evidence recovered from his home as the fruits of an illegal search. (ECF No. 20 at 6.)

## 2. Facts

On September 7 and 8, 2020, an individual uploaded three images to Microsoft's Skype program and two images to Google's Gmail program. (ECF No. 27 at 1.) Both Microsoft and Google help detect suspected child pornography by using a hash-matching technology. (*Id.* at 1-2.) A hash value is a "a string of characters obtained by processing

the contents of a given computer file and assigning a sequence of numbers and letters that correspond to the file's contents." *United State v. Reddick*, 900 F.3d 636, 637 (5th Cir. 2018). Hash values are often referred to as a "digital fingerprint." *United States v. Miller*, 982 F.3d 412, 417 (6th Cir. 2020) (quoting *United States v. Ackerman*, 831 F.3d 1292, 1294 (10th Cir. 2016)).

Microsoft and Google use hash values to identify and report child pornography by comparing the hash values of the images to those of known child pornography. (ECF No. 20 at 1-2.) If a hash value matches that of known child pornography, the companies report it (as required by law, 18 U.S.C. § 2258A) to the National Center for Missing and Exploited Children ("NCMEC"). (ECF No. 20 at 1-2.) NCMEC is a non-profit organization established by Congress to help prevent child abduction and sexual exploitation. (*Id.* at 2.) NCMEC manages the CyberTipline, a clearinghouse for complaints of child pornography. (*Id.*) When NCMEC receives a CyberTip report, it reviews the information and forwards it to local law enforcement for further investigation. (*Id.* at 3.)

On September 8, NCMEC received three reports via the CyberTipline from Microsoft. (ECF No. 20 at 3.) The reports indicated that an image file had been uploaded through Skype and provided the relevant screenname and IP address. (*Id.*) The report also indicated that Microsoft had not viewed the contents of the uploaded files, but that the images matched to hash values of known child pornography. (*Id.*)

2

On September 9, NCMEC received a report via the CyberTipline from Google. (ECF No. 20 at 3.) The report indicated that one file had been uploaded and stored in Google's Gmail Program and provided the user and IP address information. (*Id.*) The report also indicated that Google had not viewed the contents of the uploaded file, but that the image matched to the hash value of known child pornography. (*Id.*; ECF No. 27 at 1-3.)

NCMEC reviewed the CyberTips and included a geolocation of the IP address that uploaded the images. (ECF No. 20 at 3.) It noted that the CyberTip reports were related to one another and that NCMEC had not opened or viewed any of the files. (*Id.*) On October 10, 2020, NCMEC forwarded the reports to the Wisconsin Department of Justice. (*Id.* at 3-4; *see also* ECF Nos. 22-1, 22-2, 22-3, 22-4.) A Wisconsin Department of Justice-Division of Criminal Investigation ("DCI") Program and Policy Analyst reviewed the reports and issued an administrative subpoena to Charter Communications for the subscriber information for the IP address. (ECF No. 20 at 3-4.) Charter Communications provided records that identified Braun, his address, email, and phone number. (*Id.* at 4.)

On January 12, 2021, DCI Special Agent Aaron Koehler was assigned to investigate the reports. (ECF No. 20 at 4.) He viewed the images and determined them to be child pornography. (*Id.*) He surveilled Braun's residence and received information from the Lomira Police Department that in 2015 Braun's then 15-year-old son reported to a teacher,

3

who reported to the police, that he had observed Braun communicate online with very young girls. (*Id.*)

On March 2, 2021, Agent Koehler obtained a search warrant for Braun's residence. (ECF No. 20 at 4.) The affidavit in support of the warrant included information from the NCMEC CyberTipline reports, described the images, recounted Braun's identifying information, and included the 2015 report about Braun chatting online with young girls. (*Id.* at 4-5; ECF No. 22-5.) The warrant authorized the search of Braun's residence and any electronic media or storage device in the residence. (ECF No. 20 at 5.)

On March 4, 2021, law enforcement executed the warrant. (ECF No. 20 at 5.) Police recovered child pornography, including images which matched the hash values of the images in the CyberTip reports. (ECF No. 27 at 6.) Braun was charged with five counts of possession of child pornography, pled guilty to three of the charges, and was sentenced to three years in prison followed by three years of extended supervision. (ECF No. 22 at 5.) During the search, police also recovered compact disks containing child pornography that Braun recorded from his online interactions with young girls, leading to the current charges of production of child pornography. (ECF No. 27 at 6.)

**3. Standard**

"The Fourth Amendment requires that, absent certain exceptions …, police must obtain a warrant from a neutral and disinterested magistrate before commencing a search." *United States v. Mullins*, 803 F.3d 858, 861 (7th Cir. 2015) (quoting *United States v.*

4

*Robinson*, 546 F.3d 884, 887 (7th Cir. 2008)). Any such search warrant must be supported by probable cause, U.S. Const. amend. IV, and facts allegedly establishing probable cause are generally set forth in an affidavit. "Probable cause is established when, in light of the totality of the circumstances, the issuing judge can make a practical, common-sense determination that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Mullins*, 803 F.3d at 861 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

**4. Analysis**

Braun argues that the fruits of the officers' search must be suppressed because Koehler's initial viewing of the files in the NCMEC report was a warrantless search. (ECF No. 22 at 1.)

Whether Koehler's viewing of the files was an unlawful search under the Fourth Amendment depends on the application of the private search doctrine. The private search doctrine provides that the Fourth Amendment does not apply to searches by private individuals not acting as a government agent. *United States v. Bebris*, 4 F.4th 551, 560 (7th Cir. 2021). Thus, government "authorities typically may repeat a private search already conducted by a third party but may not expand on it." *Id.* When a government act exceeds the scope of the private search, whether the subsequent act is a Fourth Amendment

5

"search" depends on "the degree to which [it] exceeded the scope of the private search." *United States v. Jacobsen*, 466 U.S. 109, 122 (1984).[1]

In *United States v. Jacobsen*, a Federal Express employee opened a damaged carboard box and found crumpled newspaper covering a tube that contained a series of zip-locked plastic bags, with the innermost bag containing white powder. 466 U.S. at 112. Federal Express notified the Drug Enforcement Administration ("DEA"). *Id.* The DEA agent examined the box, took some of the white powder out of the bag, and conducted a field test of the powder. *Id.*

The Supreme Court found that the agent did not perform a "search" when examining the box because it had already been examined by a private individual. *Jacobsen*, 466 U.S. at 119. Even viewing the white powder was not a "search" because "there was a virtual certainty that nothing else of significance was in the package," and removing the white powder similarly was not a "search" because it "enabled the agent to learn nothing that had not previously been learned during the private search." *Id.* at 119-20 (noting that,

---

[1] This decision, written by Justice Stevens, came after a divided court decided a similar issue several years prior. In *Walter v. United States*, 447 U.S. 649 (1980), a private party opened a box, revealing rolls of film with suggestive drawings and sexually explicit descriptions of the films' contents. *Id.* at 651-52. An employee tried holding the film up to the light but was unable to view the film. *Id.* at 652. An FBI agent then viewed the film with a projector. *Id.* The majority of the Court found there was a Fourth Amendment violation, without agreeing on the reason. Justice Stevens wrote the opinion, joined by one other justice, finding that the FBI agent improperly expanded upon the scope of the private search by viewing the film with a projector. *Id.* at 657-59. Four dissenting members believed the labels were sufficient to extinguish any reasonable expectation of privacy. *Id.* at 663 (Blackmun, J., dissenting). In *United States v. Jacobsen*, Justice Stevens again wrote for the court, this time with a majority opinion clarifying the scope of the private search doctrine. 466 U.S. 109.

by viewing the powder, the agents were "merely avoiding the risk of a flaw in the employees' recollection," and that "[p]rotecting the risk of misdescription hardly enhances any legitimate privacy interest").

The DEA agent also did not perform a "search" when he tested the white powder because, although the test exceeded the scope of the private search, the binary test "could disclose only one fact previously unknown to the agent": whether the powder was cocaine. *Jacobsen*, 466 U.S. at 122. The test could reveal nothing of private interest, and thus was not a "search." *Id.* at 123-24 ("[T]he likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.").

This analysis has led to a circuit split in its application to companies who report hash-matched files to NCMEC, which in turn forwards the unopened file to law enforcement, who then open the file. *Compare United States v. Reddick*, 900 F.3d 636 (5th Cir. 2018); *and United States v. Miller*, 982 F.3d 412 (6th Cir. 2020); *with United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021); *and United States v. Maher*, 120 F.4th 297 (2d Cir. 2024). Companies such as Microsoft and Google act as private actors when they search users' messages to identify child pornography and report the contraband to NCMEC. *See Bebris*, 4 F.4th at 562; *but see Ackerman*, 831 F.3d at 1296 (NCMEC acts as a government agency). Under the private search doctrine, an individual does not have a privacy interest in the

information the private actor already viewed, and the government's review of that information is not a "search." But where the private actor identified a hash match and *did not* open the file, it is unsettled whether the officer's opening of the file exceeds the scope of the private search and constitutes a "search" under the Fourth Amendment.

The Fifth and Sixth Circuits found that this act is not a "search" under *United States v. Jacobsen*, 466 U.S. 109 (1984), because the reported hash match makes it virtually certain that the content is child pornography. *Reddick*, 900 F.3d at 639 (finding that, like the chemical test in *Jacobsen*, "opening the file merely confirmed that the flagged file was indeed child pornography, as suspected"); *Miller*, 982 F.3d at 429-30 (finding that opening the file is like reviewing the contents of the box in *Jacobsen*, because hash matching is so reliable that "there is a 'virtual certainty' that [the officer]'s viewing of the files would disclose the same [hash-matched] images that Google's employees had already viewed").

The Sixth Circuit points out the absurdity in finding the private search doctrine does not cover opening the hash-matched file. If a private party quickly viewed the picture before reporting it to the police, the private search doctrine would be triggered "and allow the police to reexamine the picture 'more thoroughly,' … despite the 'risk of a flaw in the [person's] recollection[.]'" *Miller*, 982 F.3d at 431 (citations omitted). "Common hash algorithms, by contrast," are "highly reliable," "catalogu[ing] every pixel." *Miller*, 982 F.3d at 430-31. The court noted, "[w]hat sense would it make to treat a more accurate search of a file differently?" *Id.*

The Second and Ninth Circuits, however, found that viewing the file is a "search" because opening the file exceeds the scope of the private search and reveals more information than the private search revealed—namely, the contents of the file. *Wilson*, 13 F.4th at 971-72; *Maher*, 120 F.4th at 306-07. Thus, under the Second and Ninth Circuits' approach, the officer must obtain a warrant to open the file before viewing it.

Braun argues that the Second and Ninth Circuits take the proper approach, and that Koehler performed a warrantless "search" by opening the file. (ECF No. 20 at 11.)

The Government argues that there was no "search" because Koehler viewed NCMEC's identical, hash-matched images, not Braun's copy of the images. (ECF No. 27 at 12.) Thus, Braun had no privacy interest in the file viewed by Koehler. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Fourth Amendment rights are personal rights which … may not be vicariously asserted." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969))). The Government further argues for the Fifth and Sixth Circuits' approach that opening a privately reported hash-matched file is not a search. (ECF No. 27 at 11.)

The Government provides no support for its position that Koehler did not view Braun's copy of the images, which is inconsistent with the record and with the operation of CyberTips. (ECF No. 22-1 at 1 ("*Files Not Reviewed by NCMEC* … One or more files uploaded in this CyberTipline report have resulted in a 'Hash Match' to a file from a previous CyberTipline report. *NCMEC staff have not viewed the uploaded files submitted with this CyberTipline report* that are designated as 'Hash Match.' The 'Hash Match' designation

9

indicates that the uploaded files match the hash values of uploaded files from a CyberTipline report that were previously viewed and categorized by NCMEC at the time this report was generated." (emphasis added)); *Id.* at 7 ("Please be advised that *NCMEC staff have not opened or viewed any uploaded files submitted with this report* at this time and have no information concerning the content of the uploaded files other than information provided in the report by the ESP." (emphasis added)).)

Assuming Koehler viewed Braun's copy of the images, doing so was still likely not a "search" because it was virtually certain that the files contained child pornography, in which Braun has no legitimate privacy interest. *Jacobsen*, 466 U.S. at 125.

Even if the Seventh Circuit followed the Second and Ninth Circuits' approach in finding that opening the file is a "search," the "search warrant based partly on [the] tainted evidence [would] 'still support a search if the untainted information, considered by itself, establishe[d] probable cause for the warrant to issue.'" *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) (quoting *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005)). The images' matching hash values to those of known child pornography alone are so reliable that they establish probable cause to believe that contraband or evidence of a crime was likely to be found in Braun's residence. *See United States v. Feldman*, No. 13-CR-155, 2014 WL 7653617, at *10 (E.D. Wis. July 7, 2014).

Having said that, however, the affidavit here was notably bare as to the fact that the images were hash matched, or as to any information on the reliability of hash

10

matching. Rather, the affidavit discussed the fact that Koehler received a report from NCMEC containing four different CyberTips from Microsoft and Google, including an image named "pedomom-and-son.jpg", and that, in 2015, Braun's then 15-year-old son told his teacher that he sees his father interact online with very young girls.

Even if the affidavit was not otherwise supported by probable cause to search Braun's residence, the good faith exception applies. The exclusionary rule is a prudential doctrine created "to 'compel respect for the constitutional guaranty.'" *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). Its "sole purpose … is to deter future Fourth Amendment violations." *Id.* at 236-37. Exclusion is appropriate only where there is "[r]eal deterrent value," and where "the deterrence benefits of suppression … outweigh its heavy costs." *Id.* at 236-37 ("Exclusion exacts a heavy toll on both the judicial system and society at large[] … [because] [i]ts bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" (citations omitted)).

Where the law is unsettled, the police conduct generally must be "'deliberate, reckless, or grossly negligent' [in order] to warrant application of the exclusionary rule." *United States v. Martin*, 807 F.3d 842, 847 (7th Cir. 2015) (quoting *Davis*, 564 U.S. at 238). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, … or when their conduct involves only simple, 'isolated' negligence,

11

… the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way[.]'" *Davis*, 564 U.S. at 238 (citations omitted) (quoting *United States v. Leon*, 468 U.S. 897, 909, 908 n.6 (1984), *and Herring v. United States*, 555 U.S. 135, 137 (2009)).

The Seventh Circuit has not addressed whether viewing a hash-matched file, reported but unopened by a private company, is a "search" under the Fourth Amendment. When Koehler viewed the files in January 2021, the Supreme Court had held that officers could perform a drug test on a substance provided by a private party to confirm the substance was contraband without running afoul to the Fourth Amendment. *Jacobsen*, 466 U.S. at 125. This line of case law, along with the lack of any authority warning against opening the privately reported, hash-matched files,[2] makes Koehler's conduct objectively reasonable. It certainly was not reckless or grossly negligent. Thus, Koehler's conduct does not warrant suppression, especially considering the heavy cost of suppression on society. (*See* ECF No. 27 at 6-7 (discussing Braun's actions of soliciting young girls, ages ranging from nine to fourteen, to engage in a video chat call with him and demanding they perform various sexual acts, including with their pets, a seven-year-old-cousin, and a grandfather).)

---

[2] *United States v. Ackerman*, 831 F.3d 1292 (10th Cir. 2016), did not deal with the issue here. *Ackerman* found a search took place where NCMEC opened all attachments in an email, where only one attachment had a hash match. It distinguished this from a case where only the hash-matched file was opened and did not resolve that issue. *Id.* at 1306. Unlike Braun's contention (ECF No. 37 at 8), this caselaw does not make Koehler's actions objectively unreasonable.

Furthermore, two circuits at the time that had considered the effect of the private search doctrine under nearly identical factual scenarios found that opening the file was lawful under *Jacobsen*. *Miller*, 982 F.3d at 430; *Reddick*, 900 F.3d at 639. No circuit had yet found that such an act constituted a Fourth Amendment "search" requiring a warrant.[3] Even the Second Circuit in *United States v. Maher*, a 2024 decision on which Braun relies, found that the search did not warrant suppression and that the good faith rule applied. 120 F.4th at 321.

Accordingly, even if Koehler effectuated a "search" by opening the files, and his affidavit otherwise failed to establish probable cause to search his residence and any electronic media or storage device in the residence, suppression still would be inappropriate under the good faith exception to the exclusionary rule. Therefore, the Court will recommend Braun's motion to suppress be denied.

**5. Conclusion**

**IT IS THEREFORE RECOMMENDED** that Braun's motion to suppress (ECF No. 20) be **denied**.

**IT IS FURTHER ORDERED**, pursuant to Rule 79(d) of the General Local Rules of the United States District Court for the Eastern District of Wisconsin, that Braun's

---

[3] The Ninth Circuit was the first court to find that opening the file was a "search" requiring a warrant, and its decision was not released until September 21, 2021, *after* Koehler opened Braun's files. *Wilson*, 13 F.4th 961. The Second Circuit did not weigh in until 2024. *Maher*, 120 F.4th 297.

13

submission filed on December 9, 2024 (ECF No. 22), in the above-named case be **SEALED** until further order of this Court.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 18th day of March, 2025.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge