**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  **v.**                                                      **Case No. 24-CR-164**

**PETER BRAUN**
        **Defendant.**

---

## ORDER

Defendant Peter Braun, charged with production of child pornography, moved to suppress evidence obtained by law enforcement during the execution of a search warrant. The magistrate judge handling pre-trial proceedings in this case issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b).

**I.**

Microsoft and Google use "hash matching" technology to detect suspected child pornography on their platforms. As the Tenth Circuit recently explained:

> A "hash value" is a short string of characters generated from a much larger string of data (say, an electronic image) using an algorithm—and calculated in a way that makes it highly unlikely another set of data will produce the same value. Hash values have been used to fight child pornography distribution, by comparing the hash values of suspect files against a list of the hash values of known child pornography images currently in circulation. This process allows potential child pornography images to be identified rapidly, without the need to involve human investigators at every stage.

United States v. Rosenschein, 136 F.4th 1247, 1253 n.1 (10th Cir. 2025) (internal citations and quote marks omitted). Federal law requires an electronic service provider ("ESP"), such as

Microsoft or Google, to report to the National Center for Missing and Exploited Children ("NCMEC") any apparent child pornography of which it is aware. 18 U.S.C. § 2258A(a)(1). ESPs report such material using the NCMEC's CyberTipline; the NCMEC, in turn, notifies the appropriate local law enforcement agency. See United States v. Bebris, 4 F.4th 551, 553 (7th Cir. 2021) (discussing this process). Sometimes an ESP employee will visually examine the suspected child pornography file prior to notifying the NCMEC; other times, the ESP relies on matching hash values.

In September 2020, the NCMEC received four CyberTipline reports (three from Microsoft, one from Google) indicating images of suspected child pornography had been uploaded to their platforms from a particular IP address. (R. 22 at 1; R. 39 at 2-3.) The reports all indicated the ESP had not viewed the contents of the uploaded files. (R. 22 at 3; R. 22-1 at 4; R. 22-2 at 4; R. 22-3 at 4; R. 22-4 at 4; R. 27 at 3; R. 39 at 2-3.) While the ESPs made four reports, just two images were involved. (R. 22-5 at 17 ¶ 34, 18 ¶ 36; R. 27 at 1; R. 37-1 at 3-4.) ESPs have created a classification system for such images, under which the letter "A" means the image involves a prepubescent minor, the letter "B" a pubescent minor, and the number "1" a sex act, the number "2" lascivious exhibition. (E.g., R. 22-2 at 5.) Here, one of the images was classified A1, the other A2. (R. 22-1 at 4; R. 22-2 at 4.)

The NCMEC placed the IP address in Lomira, Wisconsin and forwarded the reports to the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"). (R. 22 at 3-4; R. 27 at 4; R. 39 at 3.) The DCI issued an administrative subpoena for subscriber information for the IP address, determining it listed to defendant. (R. 22 at 4; R. 27 at 5; R. 39 at 3.)

In January 2021, DCI Special Agent ("SA") Aaron Koehler viewed the images from the reports and determined them to be child pornography. (R. 22 at 4; R. 37-1 at 3-4; R. 39 at 3.)

2

He then conducted surveillance of defendant's residence and received further information from the Lomira Police Department, specifically, a December 2015 report indicating a teacher of defendant's then 15-year-old son passed on information that the son had seen defendant chatting/interacting online with very young girls around the time the report was made. (R. 22-5 at 19-20 ¶ 39.)

In March 2021, Koehler applied for a warrant to search defendant's residence. (R. 22 at 4; R. 22-5 at 1, 19-20; R. 39 at 3-4.) The warrant affidavit noted the CyberTipline reports (R. 22-5 at 3 ¶ 6, 17 ¶¶ 31-33), described the two images (R. 22-5 at 17-18 ¶ 34-36), and included the 2015 report about defendant chatting online with young girls (R. 22-5 at 20 ¶ 39). Koehler averred that he believed the information provided by Microsoft and Google to be reliable and correct because it was provided as part of their official duties, and information provided by these parties in the past was found to be accurate and reliable. (R. 22-5 at 21 ¶ 43.) However, he did not discuss hash matching, in general or regarding these particular files. The application was reviewed and approved by a state prosecutor. (R. 22-5 at 21 ¶ 44.)

A Wisconsin state court judge issued the warrant (R. 22-5 at 27-34), and during execution law enforcement recovered child pornography, including the images referenced in the CyberTipline reports. (R. 27 at 6; R. 39 at 4.) State authorities prosecuted defendant for possession of child pornography, and he was sentenced to 3 years in prison. (R. 22 at 5; R. 27 at 6; R. 39 at 4.) Law enforcement also recovered various compact discs containing suspected child pornography, which, later investigation revealed, defendant had allegedly recorded from his online interactions with minor girls; this material forms the basis for the instant charges. (R. 22 at 5-6; R. 27 at 6-7; R. 39 at 4.)

3

**II.**

Defendant argues that Koehler violated the Fourth Amendment when he viewed the files reported by the NCMEC without first obtaining a warrant, and that the information Koehler learned from viewing those files was essential to establishing probable cause for the search warrant he later procured. See United States v. Shelton, 997 F.3d 749, 770 (7th Cir. 2021) ("[E]vidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information.").

The motion raises three legal issues. First, could Koehler lawfully view the files under the "private search doctrine"? See Bebris, 4 F.4th at 560 ("[A]uthorities typically may repeat a private search already conducted by a third party but may not expand on it—a legal principle that has been described as the private search doctrine."); see also United States v. Jacobsen, 466 U.S. 109 (1984); Walter v. United States, 447 U.S. 649 (1980). Courts generally agree that, in cases where a private party (such as an ESP employee) has visually examined a suspected child pornography file before passing it on to authorities, the private search doctrine permits law enforcement to also view the image without obtaining a warrant. See United States v. Maher, 120 F.4th 297, 313 n.13 (2nd Cir. 2024) (collecting cases); see also United States v. Jeffery, No. 23-4264, 2024 U.S. App. LEXIS 29787, at *9-10 (4th Cir. Nov. 22, 2024). However, there is a circuit split over whether the private search doctrine authorizes law enforcement to conduct a warrantless examination of the contents of a digital file where the ESP has not visually inspected the contents of that file but instead relied on hash matching in making a CyberTipline report. Compare United States v. Miller, 982 F.3d 412 (6th Cir. 2020) (approving warrantless examination), and United States v. Reddick, 900 F.3d 636 (5th Cir. 2018) (same), with Maher, 120 F.4th at 320 (requiring a warrant), and United States v. Wilson,

4

13 F.4th 961 (9th Cir. 2021) (same); see also United States v. Holmes, 121 F.4th 727 (9th Cir. 2024) (following Wilson). The Seventh Circuit has not weighed in on the issue.

Second, assuming Koehler's viewing of the files violated the Fourth Amendment, does the remaining information in his affidavit suffice to establish probable cause? See Shelton, 997 F.3d at 770 ("[A] search warrant that has been obtained, in part, with evidence which is tainted can still support a search if the untainted information, considered by itself, establishes probable cause for the warrant to issue."). The government argues that, given its high reliability, hash matching alone suffices to establish probable cause.

Third, assuming the government loses on the first two issues, should the motion nevertheless be denied based on the "good faith" exception to the exclusionary rule? See Davis v. United States, 564 U.S. 229, 249-50 (2011) ("We therefore hold that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply."). Courts have also differed over the scope of the exception outlined in Davis, see generally United States v. Katzin, 769 F.3d 163, 173 (3rd Cir. 2014) (en banc), including in this context, compare Maher, 120 F.4th at 321-22 (applying good faith), with Holmes, 121 F.4th at 737 (declining to apply good faith).

The magistrate judge essentially bypassed the first two issues, recommending the motion be denied under the good faith exception. The parties have, in their briefs before the magistrate judge and in this court on the objections, fully briefed the three issues outlined above.

However, there is a factual dispute that should be resolved before addressing these thorny legal questions. In its response to the motion, the government indicates that, after confirming the subject IP address had been assigned to defendant:

5

> SA Koehler then downloaded the CyberTips and related files from the Internet Crimes Against Children data system which were provided by NCMEC. SA Koehler transferred the files onto an optical disc which allowed him to visually see the images. He was able to see what image corresponded with each CyberTip, but he did not view the defendant's copy of these images, nor did he have access to the defendant's copy.

(R. 27 at 5.) Later, after arguing the court should adopt the Fifth and Sixth Circuit's positions, the government states:

> That is particularly clear in this case, where SA Koehler did not even view the <u>defendant's</u> copy of these CSAM images; instead, he viewed identical (hash-matched) images provided by NCMEC. The defendant himself had no cognizable privacy interest in the images already saved in law enforcement databases, as "Fourth Amendment rights are personal rights which … may not be vicariously asserted." <u>Plumhoff v. Rickard</u>, 572 U.S. 765, 778 (2014) (quoting <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969)). There is no dispute that the <u>exact same</u> hash-value-matched images had previously been viewed by law enforcement and by private companies, in a process that did not implicate the defendant at all. SA Koehler's re-viewing of these images when they were flagged, via hash-matching, in defendant's accounts therefore did not "compromise any legitimate interest in privacy" that the defendant still possessed. <u>Jacobsen</u>, 466 U.S. at 124.

(R. 27 at 12.)

Defendant replies that the government's claim is not supported by the record and is inconsistent with the defense's understanding of how the CyberTipline operates. He contends that federal statutes, Google's policies, the NCMEC reports in this case, and Koehler's reports all seem to demonstrate that Koehler viewed the image files defendant uploaded. Defendant indicates he is aware of no other instance in which law enforcement received a file from the NCMEC other than the file the ESP forwarded to the CyberTipline. He argues that, without any report or affidavit to establish this fact, the court should disregard the claim or, at a minimum, hold an evidentiary hearing.

The magistrate judge found the government's claim that Koehler did not view

6

defendant's copy of the images inconsistent with the record and with the operation of the CyberTipline. He cited the CyberTipline reports in this case, which indicated that "NCMEC staff have not opened or viewed any uploaded files submitted with this report." (R. 39 at 10; R. 22-1 at 7.)

However, as the government notes in the objection briefing, the CyberTipline reports state only that the NCMEC did not view the images before making its referral; those reports have no bearing on which images Koehler clicked on. The government contends the point is potentially dispositive, as defendant has no privacy interest in images already in law enforcement databases. See Holmes, 121 F.4th at 745 (Collins, J., dissenting) ("NCMEC maintains a database that includes both 'the actual files that they can run for visual matches' and 'the database of hash values for the files.'"). Defendant replies that the government continues to offer no support for this proposition, and the court should follow the magistrate judge and reject it.

Koehler's report, which defendant presented to the magistrate judge, is equivocal on this point. It states that Koehler "reviewed the CTs, along with the related case files under DCI case 20-8252 and made the following observations[.]" (R. 37-1 at 3.) The report simply does not permit the court to determine which version of the images Koehler viewed.

**III.**

**IT IS ORDERED** that this matter is scheduled for telephonic status on **Friday, June 20, 2025, at 11:00 a.m.** The court will, at the status, discuss whether further evidentiary proceedings are required to address the factual question noted above. The court finds that the ends of justice, including the complexity of the legal and factual questions presented, and the

7

possible need for further factual development on the motion, outweigh the best interests of the defendant and the public in a speedy trial. 18 U.S.C. § 3161(h)(7).

Dated at Milwaukee, Wisconsin, this 12th day of June, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge